Slip Op. 13- 152

UNITED STATES COURT OF INTERNATIONAL TRADE

XIAMEN INTERNATIONAL TRADE
AND INDUSTRIAL CO., LTD.,
ZHEJIANG ICEMAN GROUP CO., LTD.,
and FUJIAN GOLDEN BANYAN
FOODSTUFFS INDUSTRIAL CO., LTD.,

　　　　　　　　　　Plaintiffs,

v.

UNITED STATES,

　　　　　　　　　　Defendant.

Before: Richard W. Goldberg, Senior Judge
Court No. 11-00411

**OPINION AND ORDER**

[Final results of an administrative review of the antidumping duty order on certain preserved
mushrooms from the People's Republic of China remanded.]

Dated:  December 20, 2013

*Lizbeth R. Levinson* and *Ronald M. Wisla*, Kutak Rock LLP, of Washington DC, for plaintiffs.

*Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F.
Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M.
McCarthy*, Assistant Director. Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the
Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Goldberg, Senior Judge: Plaintiffs Xiamen International Trade & Industrial Co., Ltd.

("XITIC"), Zhejiang Iceman Group Co., Ltd. ("Iceman Group"), and Fujian Golden Banyan

Foodstuffs Industrial Co., Ltd. ("Golden Banyan") (collectively, "Plaintiffs") challenge the U.S.

Department of Commerce's ("Department" or "Commerce") findings in the 2009–2010

administrative review of the antidumping duty order on certain preserved mushrooms from the

People's Republic of China ("PRC").  *See Certain Preserved Mushrooms from the People's*

*Republic of China*, 76 Fed. Reg. 56,732, 56,733 (Dep't Commerce Sept. 14, 2011) (final admin.

review) ("*Final Results*"); *Certain Preserved Mushrooms from the People's Republic of China*,

76 Fed. Reg. 70,112 (Dep't Commerce Nov. 10, 2011) (am. final admin. review) ("*Amended*

*Final Results*").[1]  Specifically, XITIC challenges Commerce's selection of surrogate values for

XITIC's inputs of lime, fresh mushrooms, and mushroom spawn.  XITIC also argues that

Commerce should have applied its new surrogate labor methodology when calculating XITIC's

surrogate labor rate and financial ratios.  Iceman Group asserts that Commerce unlawfully

assigned Iceman Group a separate rate because the company was not being reviewed.  Iceman

Group and Golden Banyan also allege that Commerce's separate rate calculations incorrectly

included Guangxi Jisheng Foods, Inc.'s ("Jisheng") 266.13% partial adverse facts available

("AFA") margin.  As set forth below, the court sustains in part and remands in part.

## BACKGROUND

On March 30, 2010, Commerce initiated an administrative review of the antidumping

duty order on certain preserved mushrooms from the PRC.  *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 75 Fed. Reg.

15,679, 15,681 (Dep't Commerce Mar. 30, 2010) ("*Initiation Notice*").  Commerce initiated its

review at the request of petitioner Monterey Mushrooms ("Petitioner"), which asked that the

Department review twenty-six PRC exporters and producers of subject merchandise.  *See*

*Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 12,704,

12,704 (Dep't Commerce Mar. 8, 2011) (prelim. admin. review) ("*Preliminary Results*").  The

review period ran from February 1, 2009 to January 31, 2010.  *Id.*

---

[1] The court initially consolidated this case under consolidated case number 11-00378.  Order, Court No. 11-00378, ECF No. 15.  The court later deconsolidated the action and stayed member case number 11-00411 pending a final decision in *Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013).  Order, Court No. 11-00378, ECF No. 45.  After that decision issued, XITIC voluntarily dismissed its zeroing claim.  Order, Court No. 11-00411, ECF No. 24.  Unless otherwise specified, all ECF citations contained herein are to documents filed in Court No. 11-00378.

Commerce determined that it could only individually examine the three largest producers or exporters of subject merchandise.  Accordingly, Commerce selected XITIC, Blue Field (Sichuan) Food Industrial Co, Ltd. ("Blue Field"), and Jisheng as mandatory respondents. Resp't Selection Mem. at 5, PD I 35 (May 17, 2010), ECF No. 16 (Dec. 12, 2011) ("PD I 35"). Commerce also accorded separate rate status to certain companies, including Plaintiffs Golden Banyan and Iceman Group.  *Final Results*, 76 Fed. Reg. at 56,733.

Using India as the primary surrogate market economy country, Commerce calculated dumping margins of 13.12% for XITIC and 84.55% for Golden Banyan and Iceman Group.  *Id.* The Department later amended its *Final Results* to correct a ministerial error, which adjusted Golden Banyan's and Iceman Group's rates to 76.12%.  *Amended Final Results*, 76 Fed. Reg. at 70,113.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and must uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The Court reviews the substantiality of the evidence "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The Court employs a two-part analysis to determine whether Commerce's statutory construction is otherwise in accordance with law.  *See Chevron, U.S.A., Inc. v. Natural Res. Def.*

*Council, Inc.*, 467 U.S. 837, 842–43 (1984).  The Court first asks whether Congress has directly

spoken to the question at issue in the case.  *Id.*  If it has, the Court gives effect to Congress's

unambiguously expressed intent.  *Id.*  If Congress has not directly addressed the pertinent issue,

the Court assesses whether Commerce's interpretation "is based on a permissible construction of

the statute."  *Id.* at 843.  To survive scrutiny, Commerce need not provide "the *only* reasonable

interpretation or even the *most* reasonable interpretation" of a statutory provision.  *Koyo Seiko*

*Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

## DISCUSSION

I.   **Commerce's surrogate values for lime and mushroom spawn were not based in
     substantial evidence, and voluntary remand is appropriate so Commerce can
     recalculate XITIC's surrogate labor rate and financial ratios**

XITIC[2] challenges Commerce's selection of surrogate values for its inputs of lime,

mushroom spawn, and fresh mushrooms, as well as the methodology Commerce used to derive

XITIC's surrogate labor rate and financial ratios.  For the following reasons, the court sustains

Commerce's selection of a surrogate value for fresh mushrooms, but remands so Commerce can

reconsider its values for lime and mushroom spawn.  The court also grants the United States'

request for a voluntary remand to recalculate XITIC's surrogate labor rate and financial ratios.

### A.  Legal framework for the selection of surrogate values

A dumping margin is "the amount by which the normal value exceeds the export price or

constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  In non-market

economy ("NME") proceedings, Commerce constructs normal value by valuing the inputs used

---

[2] XITIC sold subject merchandise to the U.S. market during the period of review, but an affiliated producer apparently produced the merchandise.  *See, e.g.*, XITIC Section A Questionnaire Resp. at A-13, PD I 44 (June 16, 2010), ECF No. 16 (Dec. 12, 2011) ("PD I 44").  For purposes of this opinion, the court uses XITIC to refer to both entities.

to produce the merchandise (the factors of production)[3] plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."[4]  *Id.* § 1677b(c)(1)(B). The goal of this practice is to construct a hypothetical market value for a product, which then serves as the normal value for purposes of computing any dumping margin.  *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

Commerce selects values for each factor of production—known as "surrogate values"—"based on the best available information regarding the values of such factors in a market economy country or countries."  19 U.S.C. § 1677b(c)(1); *see also id.* §1677b(c)(4) (elaborating that, to the extent possible, Commerce must use an economically comparable market economy that is a significant producer of subject merchandise).  Because no statute or regulation defines the "best available information," Commerce has established certain non-dispositive policy preferences.  Namely, the Department prefers surrogates values that are contemporaneous with the period of review, publicly available, product-specific, representative of broad market average prices, and free of taxes and import duties.  I&D Mem. at 7, PD II 10 (Sept. 6, 2011), ECF No. 16 (Dec. 12, 2011) ("*I&D Mem.*").  Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case.  *Id.*

Commerce has broad discretion to decide which data constitute the best available information regarding the value of a particular factor.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  The role of a reviewing court is "not to evaluate whether the

---

[3] Factors of production include "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).  A respondent identifies the factors used to produce subject merchandise along with consumption rates.  Commerce then calculates the cost of each input by multiplying the consumption rate by the surrogate value.  *See* Prelim. Results Analysis Mem. at 2, PD I 107 (Feb. 28, 2011), ECF No. 16 (Dec. 12, 2011).

[4] General expenses and profit include expenses that are not traceable to a specific product.  *Dorbest Ltd. v. United States*, 30 CIT 1671, 1715, 462 F. Supp. 2d 1262, 1300 (2006).  To capture these expenses and profits, Commerce must factor in overhead, profit, and selling, general, and administrative expenses.  *Id.*  Commerce achieves this by using surrogate financial ratios.  *Id.*

information Commerce used was the best available, but" to determine "whether a reasonable

mind could conclude that Commerce chose the best available information." *Zhejiang DunAn*

*Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  To meet that standard,

Commerce must justify its surrogate value with a reasoned explanation supported by substantial

evidence.  *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269 (2006).

Though a reasoned explanation need not be a perfect explanation, Commerce must still fairly

evaluate and compare the data sets on the record using its established analytical criteria.  *Id.*

### B. Commerce's decision to value XITIC's "lime" input using GTA import data for slaked lime was not supported by substantial evidence

With that framework in mind, the court turns to XITIC's first challenge to Commerce's

surrogate values.  Commerce valued one of XITIC's factors, "lime," using Global Trade Atlas

("GTA") import data for Indian Harmonized Tariff Schedule ("HTS") subheading 2522.20

("slaked lime").  XITIC submits that this value was unsupported by substantial evidence because

record evidence suggested that XITIC used calcium carbonate (identified as Indian HTS

subheading 2836.50.00) in producing mushrooms.  Pls.' Mot. for J. on Agency R., ECF No. 23

("Pls.' Br."), at 11.

i.      Factual background

In its initial Section D questionnaire response, XITIC used the word lime to describe one

of its inputs.  XITIC clarified in a concise spreadsheet accompanying that submission that lime

was associated with PRC HTS subheading 2836.50.00 ("[c]alcium carbonate").  XITIC Section

D Questionnaire Resp. at Ex. D-5, PD I 56 (July 13, 2010), ECF No. 16 (Dec. 12, 2011) ("PD I

56").  XITIC first used the words "calcium carbonate" when submitting proposed surrogates for

use in the preliminary determination.  XITIC Proposed Surrogate Value Submission at 2, PD I 92

(Nov. 22, 2010), ECF No. 16 (Dec. 12, 2011) ("PD I 92").  In that submission, XITIC listed one

of its raw material inputs as "Lime (Calcium Carbonate)" and again supplied Indian HTS

subheading 2836.50.00 as the correct tariff number from which to draw a surrogate value.  *Id.*

      Commerce disregarded XITIC's proposed tariff number in its *Preliminary Results*, which

would have yielded a value of 6.36 Indian Rupees per kilogram ("Rs./kg.").  Prelim. Surrogate

Value Mem. at 5, PD I 110 (Feb. 28, 2011), ECF No. 16 (Dec. 12, 2011) ("PD I 110").  Instead,

Commerce valued lime at 8.96 Rs./kg. using GTA import data for slaked lime (Indian HTS

2522.20).  *Id.* at 6.  Commerce rejected XITIC's value because there was no record information

"that XITIC actually used calcium carbonate in the production of subject merchandise."  *Id.*

      In response, XITIC submitted a Wikipedia entry defining agricultural lime as "pulverized

rock containing primarily calcium carbonate."  XITIC Surrogate Value Submission at Attach. 1,

PD I 117 (Mar. 28, 2011), ECF No. 16 (Dec. 12, 2011).  XITIC later relied on that definition

when arguing that lime meant calcium carbonate, not slaked lime.  XITIC Case Br. at 2–3, PD I

119 (Apr. 7, 2011), ECF No. 16 (Dec. 12, 2011) ("PD I 119").  XITIC additionally cited record

evidence that another respondent, Blue Field, used calcium carbonate as an input.  *Id.* at 2.

      Commerce rejected XITIC's request to revalue lime in its *Final Results*.  *I&D Mem.* 27.

First, Commerce dismissed XITIC's Wikipedia entry as unreliable because it contained no

citations to outside sources supporting the article's definitions.  *Id.*  Commerce then noted that

the term "'lime' is generic, has multiple usages, and can be used to describe any treatment to

soils with a calcium compound."  *Id.*  In light of the ambiguity, Commerce decided that lime

likely meant slaked lime because calcium carbonate "lack[ed] the term lime" and "slaked lime

. . . include[d] the term lime."  *Id.*  Commerce finally concluded that "[i]f XITIC used calcium

carbonate it should have specifically so stated in its questionnaire responses, as Blue Field did,

and not leave it to a term that has multiple meanings."  *Id.*

ii.     <u>Commerce's value for lime was not supported by substantial evidence</u>

Commerce's determination was not supported by substantial record evidence.  Commerce

rejected the Wikipedia entry as unreliable and implicitly dismissed the notion that the term lime

could refer to calcium carbonate.  Nonetheless, several lines later, Commerce found that the term

"can be used to describe any treatment to soils with a calcium compound." *Id.*  By making that

general assertion, Commerce suggested that lime *could* mean either calcium carbonate or

calcium hydroxide (slaked lime), as both are calcium compounds.  *See* XITIC Third Suppl.

Questionnaire Resp. at App'x S3-1 at 35, PD I 101 (Jan. 28, 2011), ECF No. 16 (Dec. 12, 2011)

("PD I 101") (identifying slaked lime's chemical name).

Assuming that lime could reasonably refer to calcium carbonate and slaked lime,

Commerce did not effectively explain why a surrogate value for slaked lime was the best

available information regarding that input.  Initially, Commerce never found that slaked lime

could be used in producing subject merchandise.  *See Calgon Carbon Corp. v. United States*,

Slip-Op 11-21, 2011 WL 637605, at *8 (CIT Feb. 17, 2011) ("Commerce must show a rational

relationship between the surrogate value and the input to which it is applied.").  Moreover,

Commerce apparently based its selection solely on the fact that slaked lime actually contained

the word lime, while calcium carbonate did not.  That logic is flawed because, as XITIC notes,

calcium carbonate is a chemical name and slaked lime is the common name for a different

chemical compound (calcium hydroxide).  *See* Pls.' Reply in Supp. of Mot. for J. on Agency R.,

ECF No. 36 ("Pls.' Reply"), at 2; PD I 101 at App'x S3-1 at 35 (listing chemical name for slaked

lime).  Commerce's misleading and mismatched comparison of the two products did not rise to

the level of substantial evidence supporting its chosen surrogate value for lime.

Commerce's analysis was also flawed because it inaccurately presumed that nothing on

the record tied XITIC's lime input to calcium carbonate.  In fact, in its initial questionnaire

response, XITIC described lime by reference to the HTS subheading for calcium carbonate.

XITIC persisted in this classification when it submitted its proposed surrogate values before the

*Preliminary Results* and even put calcium carbonate in parentheses next to lime.  XITIC again

explained to Commerce in its case brief that it did not use slaked lime in its production process.[5]

This evidence collectively signaled that XITIC used calcium carbonate and, albeit imperfectly,

communicated this to Commerce on multiple occasions.[6]

Commerce apparently believed that XITIC should have communicated this information

more directly, like Blue Field, by listing calcium carbonate as an input on its questionnaire

responses.  However, Commerce may not ignore what XITIC did place on the record because it

wishes XITIC were more precise.  Based on the record before the court, a reasonable mind could

not conclude that Commerce chose the best available information to value XITIC's factor of

production.  Commerce is, therefore, instructed on remand to reconsider its finding that a

surrogate value for slaked lime is the best available information for valuing XITIC's lime input.

### C.  Commerce's decision to use GTA import data to value XITIC's mushroom spawn was not supported by substantial evidence

XITIC also disputes Commerce's valuation of mushroom spawn, another input that

XITIC used in producing subject merchandise.  Commerce valued mushroom spawn using GTA

import data for Indian HTS subheading 0602.90.10.  XITIC argues that Commerce's

---

[5] In its USCIT Rule 56.2 brief, XITIC also argues that it could not use slaked lime in its production process because of a possible chemical reaction. Pls.' Br. 9–10.  XITIC did not raise that argument before the agency, and the court will not consider it for the first time at this late stage.  *See* 28 U.S.C. § 2637(d) (providing that this Court "shall, where appropriate, require the exhaustion of administrative remedies").

[6] The court finds that there was evidence tying XITIC's lime input to calcium carbonate, but expresses no opinion on whether record evidence also suggested that XITIC used slaked lime as an input.  If that is the case, Commerce did not make any finding to that end on the record.

determination was unsupported by substantial evidence in essentially two ways.  XITIC avers

that, by focusing exclusively on why XITIC's proffered surrogates were flawed, Commerce

failed to explain why the GTA data were preferable.  Pls.' Br. 19–20.  XITIC additionally

submits that Commerce did not support with substantial evidence its determination that XITIC's

proffered surrogates were flawed.  *Id.* at 20.  Specifically, XITIC asserts that Commerce based

its dismissal of XITIC's surrogates on impermissible speculation.  *Id.* at 20–21.

i.   <u>Factual background</u>

In proceedings before Commerce, XITIC proposed two surrogate values to value

mushroom spawn—one derived from a 2004–2005 annual report of Agro Dutch Industries

Limited ("Agro Dutch"), and the other from a 2007–2008 annual report of Himalya International

Limited ("Himalya").  PD I 92 at 3.  Commerce instead valued mushroom spawn at 217.38

Rs./kg. using GTA import data for Indian HTS subheading 0602.90.10 (mushroom spawn).  PD I

110 at 6.  Commerce preliminarily dismissed XITIC's proffered data, which would have resulted

in surrogate values of approximately 115.38 Rs./kg. or 36.97 Rs./kg., because that data "did not

include broad market averages."  *Id.*

In its case brief, XITIC asserted that the GTA data were not specific to XITIC's input.

PD I 119 at 6.  In particular, XITIC argued that it only used white button mushroom spawn and

that the GTA basket data encompassed all four types of mushroom spawn sold in India.  *Id.*

XITIC thus advocated for the use of its own surrogates based on Agro Dutch and Himalya data.

Petitioner criticized XITIC's proposed data, citing the following language from a 2009–

2010 report of a different Indian mushroom producer, Flex Foods Limited ("Flex Foods"):

> The yield of mushroom to a great extent depends upon quality of spawn.  Good
> quality of spawn should be contamination free with high yield potential.  The non-
> availability of quality spawn is a common problem of large mushroom growers.

Pet'r's Rebuttal Br. at 10, PD I 123 (Apr. 14, 2011), ECF No. 16 (Dec. 12, 2011) (emphasis

omitted).  Petitioner reasoned that Agro Dutch and Himalya, both large mushroom growers, must

have also experienced difficulty obtaining high-quality spawn.  For that reason, Petitioner

questioned the "quality and applicability of" the companies' data.  *Id.*

    Commerce continued to use the GTA data to value mushroom spawn in its *Final Results*,

but never directly stated why the non-specific GTA data were the best available information

regarding the value of mushroom spawn.  Instead, Commerce explained why both of XITIC's

surrogates were flawed.  Commerce believed the Agro Dutch and Himalya reports were

imperfect because they were "not representative of broad market averages, free of taxes and

import duties, or contemporaneous with the" review period.  *I&D Mem.* 28.  Commerce also

concurred with Petitioner "regarding the common problem of the availability of quality spawn

for large mushroom growers."  *Id.*  Commerce elaborated:

> Due to the size and nature of Flex Foods, Agro Dutch, and Himalaya [sic], they
> would be affected by the shortage of quality spawn and would most likely have to
> use lower quality spawn.  Such usage of lower quality spawn would not be
> reflective of the high quality spawn indicated by XITIC.

*Id.*

    ii.    Commerce's value for mushroom spawn was not supported by substantial
           evidence

    The court agrees with XITIC that Commerce erred by not explaining why the GTA data

was the best available information for valuing mushroom spawn.  To support a surrogate value

with substantial evidence, Commerce "must do more than simply identify flaws in the data sets it

rejects."  *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1417, 460 F.

Supp. 2d 1365, 1369 (2006); *see also Shanghai Foreign Trade Enters. Co. v. United States*, 28

CIT 480, 495, 318 F. Supp. 2d 1339, 1352 (2004) (noting that Commerce errs by "discard[ing]

the alternatives as flawed" without "evaluat[ing] the reliability of its own choice"). "Commerce

must also apply the same criteria to the data upon which it relies, and explain how the preferred

data meet these criteria, or why a given criterion should not apply to the preferred data."

*Guangdong Chems.*, 30 CIT at 1417, 460 F. Supp. at 1369. Moreover, though Commerce need

not rely on perfect data, it must explain why its data are superior to competing values. *See*

*Dorbest*, 30 CIT at 1675, 462 F. Supp. 2d at 1268 (explaining that the "'best' choice is

ascertained by examining and comparing the advantages and disadvantages of using certain data

as opposed to other data"). Here, Commerce neither critically evaluated the non-specific GTA

data nor compared that data against XITIC's proffered data. Therefore, remand is appropriate so

Commerce can fully explain whether the data it selected comports with its statutory duty to use

the best available information.[7]

 The court also agrees that Commerce poorly reasoned its rejection of XITIC's proposed

surrogate values. Commerce dismissed the Agro Dutch and Himalya reports because the data

contained therein were not (1) contemporaneous with the period of review, (2) representative of

broad market averages, (3) free of taxes and import duties, or (4) reflective of the high-quality

spawn that XITIC uses to produce subject merchandise. While XITIC does not challenge the

first three of Commerce's findings, XITIC correctly argues that Commerce failed to support its

conclusion that the Agro Dutch and Himalya data did not reflect XITIC's high-quality spawn.

*See* Pls.' Br. 20–21.

---

[7] Commerce explained elsewhere that it uses GTA data because it satisfies the Department's preference for publicly-available information representative of broad market averages. PD I 110 at 3. Presumably, Commerce used the GTA data to value mushroom spawn for those reasons. However, Commerce never so stated, and more importantly, Commerce never explained why the GTA data fit its selection criteria better than XITIC's data. This failure is especially notable because XITIC raised specificity concerns in its case brief. Though the Government summarily addresses the specificity issue in its responsive briefing, *see* Def.'s Br. 30, the court cannot accept these post-hoc rationalizations, *see Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

In concluding that the Agro Dutch and Himalya data did not properly value XITIC's input, Commerce reasoned that those companies would experience difficulty obtaining high-quality spawn in the market.  As a result, they would purchase lower-quality spawn, and lower-quality spawn was not reflective of XITIC's high-quality spawn.  *I&D Mem.* 28.  Commerce's analysis is flawed because it relies exclusively on unfounded assumptions.

First, Commerce assumed that Agro Dutch (in 2004–2005) and Himalya (in 2007–2008) had difficulty obtaining high-quality spawn because they were large mushroom producers.  But the report undergirding this assumption refers only to one company's experience during the 2009–2010 year.  Commerce also assumed without any knowledge that large mushroom growers purchased low-quality spawn just because they had difficulty obtaining high-quality spawn.  Lastly, Commerce assumed that XITIC used high-quality spawn in manufacturing subject merchandise and that the Agro Dutch and Himalya data for lower-quality spawn did not reflect XITIC's input.  Yet, if that is the case, Commerce did not cite (nor can the court locate) any record support for its assertion that XITIC used high-quality spawn.

In sum, based on this record, the court cannot find that Commerce supported its surrogate value for mushroom spawn with substantial evidence.  On remand, Commerce must reconsider whether its proffered data is the *best* available information for valuing mushroom spawn.  In doing so, Commerce must address what fairly detracts from the reliability of its selected surrogate value.  Therefore, Commerce must consider XITIC's argument that the GTA data were not specific to subject mushrooms, especially because the GTA value is more than double XITIC's competing surrogate values.  Finally, Commerce must revisit the reliability of the Agro Dutch and Himalya data and clearly explain why it believes that data do not accurately approximate XITIC's "high quality" mushroom spawn.

**D. Commerce's decision to value fresh mushrooms using the average of a price range found in a Flex Foods report was supported by substantial evidence**

XITIC's final challenge to the valuation of XITIC's raw material inputs pertains to Commerce's selection of a surrogate value for fresh mushrooms. *See* Pls.' Br. 11–17. Commerce valued fresh mushrooms using a 2009–2010 annual report for Flex Foods, an Indian purchaser of fresh mushrooms. That report provides a range of prices for fresh mushrooms, from which Commerce selected the average as a surrogate value. XITIC argues that Commerce should have used sales data from various Agro Dutch reports to value fresh mushrooms, or at least valued fresh mushrooms using the low end of the Flex Foods price range. *Id.*

i.   Factual background

XITIC proposed that Commerce value fresh mushrooms at 12.12941 Rs./kg., a figure derived from a 2009–2010 annual report for Agro Dutch. PD I 92 at 3, Attach. 4 at 29. Although Agro Dutch primarily sold canned mushrooms during the 2009–2010 period, it also reported volume and value figures for a smaller quantity of fresh mushroom sales.

Commerce preliminarily rejected XITIC's proffered value as well as a comparatively higher value submitted by Petitioner. PD I 110 at 7. According to Commerce, Agro Dutch's 2009–2010 data were unreliable because the company reported a loss that fiscal year. *Id.* Commerce instead relied on statistics from Agro Dutch's 2006–2007 annual report to extrapolate a surrogate value of 14.69 Rs./kg., which Commerce then inflated to 17.02 Rs./kg. to make it contemporaneous with the period of review. *Id.*

After the *Preliminary Results*, Petitioner maintained that the Agro Dutch report did not reflect market conditions in India because it was based on sales of a relatively small quantity of fresh mushrooms occurring at "fire-sale" prices below the cost of production. *See* Pet'r's Case Br. at 3–5, PD I 120 (Apr. 7, 2011), ECF No. 16 (Dec. 12, 2011) ("PD I 120"). To corroborate

its assertions regarding Agro Dutch's data, Petitioner cited the 2009–2010 annual report from

Flex Foods.  *Id.*  Summarizing Flex Foods' experience in the market, that report provided:

> When there is a glut in the market, the price of mushroom falls down to Rs. 20-30/Kg but as the demand increases or there is shortage [sic] of mushrooms in the market the price rises up to Rs. 60-70/Kg.  Thus there is always an uncertainty in market prices of mushroom which reduces the amount of net profit and this discourages the mushroom growers.  This problem gets aggravated during peak production months . . . .

Commerce Surrogate Values Source Docs. at Ex. 4 at 5, PD I 106 (Feb. 28, 2011), ECF No. 16

(Dec. 12, 2011).

XITIC argued in rebuttal that Commerce should continue to use the 2006–2007 Agro

Dutch data because they were both verified by certified public accountants and based on a large

number of actual sales occurring over an extended period of time.  XITIC Rebuttal Br. at 2, PD I

122 (Apr. 12, 2011), ECF No. 16 (Dec. 12, 2011).  XITIC did not criticize the accuracy of

Petitioner's corroborative Flex Foods data, but averred that the Agro Dutch data were consistent

with the values in the Flex Food report.  *Id.* at 4–5.

Commerce rejected both proposed surrogates and, therefore, changed its surrogate value

for fresh mushrooms between the *Preliminary Results* and *Final Results*.  Commerce agreed that

the "Agro Dutch data are now two years old, and may not be as representative of a variety of

market conditions as are other data on the record."  *I&D Mem.* 8.  Further, Commerce questioned

the reliability of the Agro Dutch data because it was unclear how many transactions were

reflected in the sales volume and value figures.  *Id.*  Commerce found that the Flex Foods data,

by contrast, were both contemporaneous and "representative of a variety of market conditions

affecting the price of fresh mushrooms in India."  *Id.* at 9.  The data were also specific to button

mushrooms, and therefore specific to subject merchandise.  *Id.*

When selecting among the range of prices provided in the Flex Foods report, Commerce

used the average of the low- and high-bounds.  *Id.*  Commerce reasoned that an average was

appropriate because the information on the record did not signal "which (if either) of these two

conditions may have prevailed in India during the POR, or for how long."  *Id.*

> ii.   Commerce's value for fresh mushrooms was supported by substantial
>       evidence

Before this court, XITIC contests Commerce's final surrogate value on multiple grounds.

Initially, XITIC revives its argument that the best available information for valuing fresh

mushrooms is the 2009–2010 Agro Dutch report.  Pls.' Br. 13.  XITIC argues, alternatively, that

Commerce should have continued to use inflated 2006-2007 Agro Dutch data to value fresh

mushrooms.  *Id.* at 14.[8]  According to XITIC, the data from the Agro Dutch reports are "vastly

superior" because they are based on documented sales transactions, as opposed to "a generalized

description of the range of market prices" that Flex Foods experienced.  *Id.*  XITIC also submits

that the Agro Dutch data are equally representative of market averages because, like the Flex

Foods data, they reflect only one company's experience in the market.  *Id.* at 15.

Commerce supported with substantial evidence its conclusion that the Flex Food data

were the best source of information for valuing fresh mushrooms.  Commerce reasonably

decided to use the Flex Foods report because it was (1) contemporaneous, (2) publicly available,

(3) specific to button mushrooms, and (4) representative of a variety of market conditions

affecting fresh mushroom prices.  *I&D Mem.* 9.  Commerce also explained why both Agro Dutch

data sets were not better valuation sources.

---

[8] XITIC also suggests that Commerce acted unreasonably by finding that the 2006–2007 Agro Dutch data
were the best available during the *Preliminary Results* and later attacking the same data on contemporaneity grounds
in the *Final Results*.  Pls.' Br. 12–13.  "However, preliminary determinations are 'preliminary' precisely because
they are subject to change."  *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Commerce
did not even discuss the excerpt from the Flex Foods report in the *Preliminary Results* because no one advocated for
the data's use as a surrogate value for fresh mushrooms.  In the face of an evolving administrative record containing
multiple data sets, Commerce reasonably shifted course between its preliminary and final determination.

Commerce explained that it dismissed the 2009–2010 Agro Dutch data, notwithstanding

its contemporaneity, because Agro Dutch reported a loss during the 2009–2010 financial year.

*See* PD I 110 at 7.  Presumably, Commerce interpreted this to mean that the data were unreliable

for use as a surrogate value, or at a minimum that they were not the best available information

for valuing fresh mushrooms.  *See Ceramica Regiomontana, S.A. v. United States*, 810 F.2d

1137, 1139 (Fed. Cir. 1987) (sustaining decision "of less than ideal clarity" because the agency's

path was reasonably discernible).  This decision comports with Federal Circuit precedent.  *See*

*QVD Food*, 658 F.3d at 1325–26 (upholding Commerce's rejection of company financial data

reported during a period of "serious financial trouble"); *see also Shanghai Foreign Trade*

*Enters.*, 28 CIT at 489, 318 F. Supp. 2d at 1347 (upholding Commerce's decision to disregard

contemporaneous financial data compiled in year where company sustained a loss).

Commerce also explained that it rejected the 2006–2007 Agro Dutch report because,

unlike the Flex Foods report, it was neither contemporaneous with the period of review nor as

representative of broad market averages.  Specifically, Commerce noted that while the Agro

Dutch report "provides the only data on the record that give fresh mushroom sales volume and

value figures," the report did not indicate how many unique transactions were reflected in those

figures or the timing of the transactions.  *I&D Mem.* 8.  The data could have been unreliable if,

for example, they were based on a small number of large sales or if all the sales occurred within

a condensed timeframe.  Due to this uncertainty, Commerce preferred the Flex Foods report

because it provided a broad range reflecting market fluctuations throughout the review period.

XITIC alleges that there was "no basis in the administrative record for Commerce to have

concluded that the Flex Foods description of the range of prices during the period of review

somehow reflected a broader market than the Agro Dutch data."  Pls.' Br. 15.  However, XITIC

misinterprets Commerce's actual conclusion.  Commerce did not find that the Flex Foods data

*necessarily* reflected a broader market, but rather that the Agro Dutch data "*may* not be as

representative of a variety of market conditions."  *I&D Mem.* 8 (emphasis added).  Commerce's

concerns regarding the representativeness of the Agro Dutch data were well-founded.  Fresh

mushroom sales comprised only a small percentage of Agro Dutch's overall sales, and

Commerce did not know whether the relatively sparse mushroom sales reflected a range of

market conditions.  Since the Flex Foods data provided the certainty that the Agro Dutch data

lacked, Commerce reasonably preferred the Flex Foods data to value fresh mushrooms.

The court next addresses whether Commerce supported its decision to use the average of

the Flex Foods range when valuing fresh mushrooms.  XITIC asserts that the low end of the Flex

Foods range more accurately approximates what XITIC would have paid for fresh mushrooms in

a comparable market economy.  Citing record evidence, XITIC avers that it only purchased fresh

mushrooms during peak production periods and that the surrogate value should, similarly, reflect

purchases made during this time.  *See* Pls.' Br. 16 (citing PD I 44, App'x A-17 (containing

XITIC brochure listing mushroom's season as December to April); PD I 101, App'x S3-1 at 28–

29 (discussing mushroom growing seasons in North China)).  XITIC further argues that if the

surrogate value reflected prices during peak production periods, it would be close to 20 Rs./kg.

because there would likely be an excess supply, or glut, in the market.  *See id.* at 16–17.

XITIC's speculative arguments do not undermine Commerce's reasoned decision to use

the average of the Flex Foods prices.  Initially, XITIC assumes that there is ample record

evidence supporting its argument that it only purchases fresh mushrooms during months of peak

production.  But the corroborative evidence XITIC cites never actually states that proposition.

Indeed, though XITIC suggests mushroom harvest season stretches from January to mid-April,

XITIC indicated in a questionnaire response that it purchased fresh mushrooms between October

and December.  *See* PD I 56 at 10.  Moreover, XITIC concludes without any evidentiary support

that peak mushroom season necessarily corresponds with a glut in the market for the length of

that season.  This unsupported claim paints an overly simplistic picture of the fresh mushroom

market by both assuming that mushroom producers oversupplied the market during the period of

review and ignoring that market prices are not set exclusively by supply.

### E.  Voluntary remand is appropriate so Commerce can recalculate XITIC's surrogate labor rate and financial ratios

Lastly, XITIC challenges the methodology Commerce used to calculate its surrogate

labor rate and surrogate financial ratios.  XITIC's argument turns on changes that Commerce

made to its labor methodology during the administrative review at issue in this case.  *See*

*Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the*

*Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011).  When

Commerce announced its new procedures, it indicated that it would employ the revised

methodology to pending proceedings if "feasible" in light of statutory deadlines.  *Id.* at 36,093.

Commerce did not apply the revised methodology to XITIC, but it did in other review

proceedings initiated in the same month.  Pls.' Br. 24.  XITIC asserts that Commerce's disparate

treatment rendered the surrogate labor rate calculations unsupported by substantial evidence.

The Government agrees that it should have calculated XITIC's surrogate labor rate and

surrogate financial ratios using the revised methodology.  Def.'s Resp. to Pls.' Mot. for J. on

Agency R., ECF No. 30 ("Def.'s Br."), at 33.  Therefore, the Government requests a voluntary

remand granting the agency sixty days to make necessary adjustments.  *Id.*  Because the

Government has raised a "substantial and legitimate" concern, the court remands for

recalculation.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (noting

that "if the agency's concern is substantial and legitimate, a remand is usually appropriate"); *Ad*

*Hoc Shrimp Trade Action Comm. v. United States*, 37 CIT __, __, 882 F. Supp. 2d 1377, 1381

(2013) (providing that Commerce's concerns are substantial and legitimate when, *inter alia*,

Commerce offers a compelling justification for its request).

> **II.     Commerce lawfully included Iceman Group as a separate rate company but did not support its calculation of Iceman Group and Golden Banyan's separate rates with substantial evidence**

Two separate rate respondents, Iceman Group and Golden Banyan, challenge the separate

rates that Commerce calculated in this administrative review.  Iceman Group avers that

Commerce never initiated a review for Iceman Group and that it was, thus, not lawfully covered

by the review.  Iceman Group contends, alternatively, that Commerce improperly included one

mandatory respondent's large margin in the calculation of Iceman Group's separate rate.  Golden

Banyan joins in this alternative claim.  As discussed below, the court sustains with regard to the

inclusion of Iceman Group, but remands on the issue of the separate rate calculation.

> **A.  Legal framework for initiation of reviews and assignment of separate rates**

The United States has a "retrospective" assessment system whereby final liability for

antidumping duties is determined after importation.  19 C.F.R. § 351.212(a).  As such, importers

deposit estimated duties at importation, and actual duty assessment often occurs in an

administrative review proceeding covering an already lapsed discrete period of time.  *Id.*

Commerce does not automatically conduct administrative reviews for all subject

merchandise that entered during the period of review.  To secure review, interested parties must

identify specific exporters or producers for which a review is requested.  *Id.* § 351.213(b).

Commerce publicly lists those companies in a Federal Register notice.  If entries are not covered

by a review, Commerce instructs Customs to assess duties at the cash deposit rate at entry.  *Id.*

§ 351.212(c)(1).  If entries are covered by a review, Commerce "review[s] . . . and determine[s] . . . the amount of any antidumping duty" and assesses final duties.  19 U.S.C. § 1675(a)(1)(B).

Commerce may determine that it is not practicable to calculate individual dumping margins for every company subject to a review.  *Id.* § 1677f-1(c)(2).  In that scenario, Commerce limits its analysis to a sample of mandatory respondents (often with the largest export volumes of subject merchandise).  *See id.*; *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372–73 (Fed. Cir. 2013).  In market economy proceedings, Commerce calculates an "all-others" rate for companies that were not individually investigated.  19 U.S.C. § 1673d(c)(5).  That rate is usually a weighted average of the mandatory respondents' rates, excluding any zero or *de minimis* rates and any rates based entirely on facts available or AFA.  *Id.* § 1673d(c)(5)(A).

In NME proceedings, Commerce employs a different procedure.  The Department begins with a rebuttable presumption that all NME exporters and producers are subject to government control.  *See, e.g.*, *Yangzhou Bestpak*, 716 F.3d at 1373.  Thus, the Department assigns a single PRC-wide rate to all companies unless a company establishes the absence of *de jure* and *de facto* government control.  *Id.*  The PRC-wide rate is usually based on total AFA.  *Id.*

Companies usually establish the absence of government control through separate rate applications or certifications.  *Id.* at 1374.  Non-mandatory respondents that successfully rebut the presumption of control are known as separate rate respondents.  *Id.*  Though not compelled by statute, Commerce calculates separate rates for non-mandatory separate rate respondents in the same way that it calculates all others rates in market economy investigations.  *Id.*

### B.   Commerce's decision to assign a separate rate to Iceman Group was in accordance with law

Iceman Group alleges that the Department did not comply with relevant law and past practice when it conducted a review for a company not specifically identified in Commerce's

initiation notice. Pls.' Br. 25, 29–33. Iceman Group argues that Commerce was instead required

to instruct U.S. Customs and Border Protection ("CBP") to liquidate Iceman Group's entries at

the cash deposit rate in effect at entry (zero percent). *Id.* at 31. According to Iceman Group, its

accidental participation in the review did not absolve Commerce of its duty to follow its own

regulations. *Id.* at 32. Some background is helpful to understand Iceman Group's claim.

i.      Factual background

In this case, Petitioner requested an administrative review for a company identified as

"Zhejiang Iceman Food Co., Ltd." ("Iceman Food"). Pet'r's Req. for Review at 9, PD I 1 (Mar.

1, 2010), ECF No. 16 (Dec. 12, 2011). Petitioner's request did not encompass Iceman Group,

and Commerce did not initiate a review for that company. *See Initiation Notice*, 75 Fed. Reg. at

15,681. Shortly after initiating its review, Commerce instructed CBP to liquidate entries from

specified separate rate companies that were not subject to the review. *See* Pls.' Br. at Attach. 1.

Iceman Group had previously obtained a separate rate and was not nominally subject to the

review, but Commerce nonetheless omitted Iceman Group from its liquidation instructions. *Id.*

Kutak Rock LLP appeared in the review proceeding on behalf of Iceman Food a few

weeks later. Kutak Rock Notice of Appearance at 1, PD I 7 (Apr. 5, 2010), ECF No. 16 (Dec.

12, 2011). Counsel later began referring to its client as Iceman Group in a separate rate

certification. *See* Iceman Group Separate Rate Certification at 1, PD I 33 (Apr. 29, 2010), ECF

No. 16 (Dec. 12, 2011) ("PD I 33"). In that certification, counsel listed the email address for

Iceman Group as "jacky@icemanfood.com." *Id.* at 2.

In the *Preliminary Results*, Commerce determined that Iceman Group (not Iceman Food)

was entitled to separate rate status and assigned the company a separate rate of 53.69%. *See* 76

Fed. Reg. at 12,710. Iceman Group did not comment on those results, and Commerce continued

to list Iceman Group in its *Final Results*.  Shortly thereafter, Iceman Group realized that it was

not named in the initiation notice and submitted a ministerial error allegation.  *See* Iceman Group

Ministerial Error Allegation, PD II 30 (Oct. 25, 2011), ECF No. 16 (Dec. 12, 2011).

In that submission, Iceman Group alleged that the review covered only Iceman Food and

asked to be omitted from the amended final results.  *Id.* at 3.  Iceman Group cited Commerce's

behavior in a subsequent administrative review in support.  In that review, Petitioner again listed

Iceman Food in its request.  *Id.* at 4.  But this time, Commerce recognized the error and

instructed Customs to liquidate Iceman Group's entries at the cash deposit rate at entry.  *Id.*

In rejecting Iceman Group's request, Commerce found, first, that Iceman Group's

submission did not raise a genuine ministerial error.  *See Amended Final Results*, 76 Fed. Reg. at

70,113 (citing 19 U.S.C. § 1675(h); 19 C.F.R. § 351.224(f)).  Moreover, Commerce identified

four reasons for equating Iceman Group with Iceman Food:

> (1) Counsel filed an entry of appearance on behalf of Iceman Food on April 5,
> 2010; (2) Iceman Group, which never filed a separate notice of appearance, filed a
> certification for a separate rate on April 29, 2010; (3) the separate rate
> certification filed by Iceman Group lists the company Web site as
> *www.icemanfood.com* and the company email address as
> "*jacky@icemanfood.com*;" [sic] and (4) Iceman Group did not comment on the
> *Preliminary Results*, which specifically list Iceman Group as preliminarily
> receiving a separate rate.

*Id.*

### ii.   Commerce lawfully included Iceman Group in the review

Iceman Group contends that Commerce's failure to follow the automatic assessment

procedures set forth in 19 C.F.R. § 351.212(c) is dispositive.  In other words, because Commerce

did not receive a request for a review for Iceman Group, Commerce's subsequent inclusion of

Iceman Group as a separate rate company was *ultra vires*.  Pls.' Br. 31 (relying on regulatory

language indicating that Commerce "will" instruct Customs to liquidate the unreviewed entries at

their cash deposit rate).  Based on the unique circumstances of this case, the court declines to adopt Iceman Group's belated and overly narrow arguments.

Because Commerce did not initiate a review for Iceman Group, Commerce should have included Iceman Group in its non-review liquidation instructions pursuant to § 351.212(c). However, rather than alert Commerce to the flawed instructions, Iceman Group's counsel appeared in the proceeding on behalf of Iceman Food and filed a separate rate certification for Iceman Group.  When Commerce assigned Iceman Group a separate rate, Iceman Group filed no response.  This behavior, among other evidence, reasonably led Commerce to find that Iceman Group and Iceman Food described the same company.[9]

After having long acquiesced in Commerce's misconception, Iceman Group claimed after the *Final Results* that assigning Iceman Group a separate rate was a ministerial error.  Iceman Group was in an awkward position to make this claim, though, because Commerce merely complied with Iceman Group's own request for a separate rate.  Indeed, Iceman Group did not explain how Commerce's alleged ministerial error fit the legal definition of that term, and Commerce found that it did not.  *See Amended Final Results*, 76 Fed. Reg. at 70,113.

Even assuming that Iceman Group raised an actual ministerial error, Commerce does not abuse its discretion when it declines to correct a ministerial error that was reflected in a review's preliminary results and that no one challenged.  *See QVD Food*, 658 F.3d at 1328.  In these *Preliminary Results*, Commerce published a separate rate for Iceman Group.  At that point, Iceman Group was conclusively on notice of Commerce's belief that Iceman Group was the same entity as Iceman Food.  Since it did not challenge the appropriateness of the rate at that juncture, Commerce did not commit reversible error by not correcting the mistake later.  *See id.*

---

[9] Though not on the record in the review, Iceman Group admits in briefing before the court that Iceman Food is the company's former name.  *See* Pls.' Br. 26 n. 2.

The court is not persuaded that relevant law compels a different result.  19 U.S.C.

§ 1675(a) requires only that Commerce publish notice of reviews in the Federal Register, but

neither mandates the substance of the notice nor prescribes a particular method for assessing

final duties on unreviewed entries.  Commerce established its own method for assessing duties

on non-reviewed entries in 19 C.F.R. § 351.212(c).  Notably, though, that regulation was chiefly

designed to "reduce the administrative burden on [Commerce] of automatically reviewing every

outstanding order," not to benefit respondents.  *See* H.R. Rep. No. 98-725, at 22–23 (1984),

*reprinted in* 1984 U.S.C.C.A.N. 5127, 5149.

Critical to the outcome here, this is not a case where Commerce omitted a company from

an initiation notice and that company did not participate because it believed it was excluded from

the review.  It would be unlawful to bind an unsuspecting company in that scenario, as the

company would not have notice or "recourse to protect itself against an unfavorable antidumping

duty."  *See Transcom, Inc. v. United States*, 294 F.3d 1371, 1379 (Fed. Cir. 2002).[10]  The facts

here are different.  Iceman Group clearly knew that it was the intended subject of the review.

That knowledge led Iceman Group to seek and receive a separate rate in its own name.

Consequently, Iceman Group cannot seriously claim that its inclusion in the review "c[a]me as a

surprise," nor can it somehow allege that it was unable to protect its interests.  *See id.*; *accord*

*UCF Am. Inc. v. United States*, 18 CIT 1074, 1081, 870 F. Supp. 1120, 1126 (1994) (upholding

Commerce's inclusion of non-named companies when companies "were afforded an opportunity

---

[10] In *Transcom*, 294 F.3d at 1378, the Federal Circuit interpreted the statutory and regulatory provisions to require "that 'any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce Department policy, whether particular entries in which it has an interest may be affected by the administrative review.'" (citation omitted).  The court elaborated that the underlying purpose of the notice provisions is to "provide[] notice that the exporters' interests might be affected" so that an exporter can protect its interests by proving its entitlement to a separate rate.  *Id.* at 1379.  In this case, the notice of initiation itself may have been deficient.  Nonetheless, that deficiency did not prejudice Iceman Group, as it believed it was covered by the review and ultimately received a separate rate.

to defend their interests" and therefore "suffered no prejudice"). *Cf. Sigma Corp. v. United States*, 17 CIT 1288, 1298, 841 F. Supp. 1255, 1264 (1993) (ordering assessment at cash deposit rate at entry because company did not know it was being reviewed and did not participate).[11]

### C.  Commerce's separate rate calculation methodology was not supported by substantial evidence

As an alternative claim, Iceman Group (joined by Golden Banyan) alleges that Commerce unlawfully included mandatory respondent Jisheng's 266.13% margin in its separate rate calculations.[12]  Iceman Group and Golden Banyan also argue that Commerce's separate rates were not supported by substantial evidence even if it were proper to include Jisheng's margin. Specifically, Iceman Group and Golden Banyan claim that Commerce did not explain how the separate rate reasonably reflected those companies' commercial activities, and that Commerce's failure rendered the *Amended Final Results* unsupported by substantial evidence.

### i.  Factual background

To calculate Golden Banyan's and Iceman Group's separate rates, Commerce followed its normal practice of weight averaging the margins of the three mandatory respondents in this case.  Because none of the mandatory respondents received zero, *de minimis*, or "entirely" facts available margins, the Department included all three rates in its calculations.  *See Final Results*, 76 Fed. Reg. at 56,733 (following framework in 19 U.S.C. § 1673d(c)(5)(A)).  The final separate rate was 76.12%, the weighted average of Blue Field's 2.17% margin, XITIC's 13.12% margin,

---

[11] The court is equally unpersuaded that Commerce's practice requires a different result.  Initially, what Commerce did in a subsequent review of this order is not binding in the present review.  *See U.S. Steel Corp. v. United States*, 33 CIT 984, 1003, 637 F. Supp. 2d 1199, 1218 (2009).  Moreover, the proceedings that Iceman Group cites to establish Commerce's prior practice are inapposite.  *See* Pls.' Br. 32.  Those proceedings simply do not mirror the facts of the case at bar.

[12] Iceman Group and Golden Banyan did not raise this issue before the agency because Jisheng's margin did not exceed the PRC-wide rate until the *Final Results*.  Because the basis for their claim did not arise until after the *Final Results*, Iceman Group and Golden Banyan are not precluded from raising the issue here.  *See, e.g.*, *U.S. Magnesium LLC v. United States*, 31 CIT 988, 990 (2007).

and Jisheng's 266.13% margin.  *See id.* (containing final margins for XITIC and Jisheng);

*Amended Final Results*, 76 Fed. Reg. at 70,113 (containing final margin for Blue Field).

Jisheng's 266.13% margin was based on partial, but not total, AFA.  *Preliminary Results*,

76 Fed. Reg. at 12,709–10.  Nonetheless, the PRC-wide rate for the review period was a

comparatively smaller 198.63%.  *Id.* at 12,710.  The PRC-wide rate is typically based on total

AFA, and it appears that was true here.  *See Yangzhou Bestpak*, 716 F.3d at 1373; *Certain*

*Preserved Mushrooms from the People's Republic of China*, 71 Fed. Reg. 64,930, 64,933 (Dep't

Commerce Nov. 6, 2006) (prelim. admin. review) (noting PRC-wide rate based on total AFA).

                    ii.      Commerce did not support its methodology with substantial evidence

The question before the court is whether Commerce could reasonably interpret 19 U.S.C.

§ 1673d(c)(5) to permit Commerce's methodology in this case.  Because § 1673d(c)(5)

establishes procedures for calculating an all others rate in market economy investigations, it does

not speak directly to calculating a separate rate in NME reviews.  *See Chevron*, 467 U.S. at 842.

Nonetheless, Commerce has consistently applied that statute's framework when determining

separate rates, apparently equating the all others rate with separate rates in the NME context.

The Federal Circuit has implicitly accepted Commerce's practice.  *See, e.g.*, *Yangzhou Bestpak*,

716 F.3d at 1377–38 (analyzing Commerce's separate rate calculations under § 1673d(c)(5)).

Since there is no statute or regulation directly on point, "Commerce has a measure of

discretion in determining what methodology to employ."  *Albemarle Corp. v. United States*, 37

CIT __, __, 931 F. Supp. 2d 1280, 1291 (2013).  Here, Commerce applied the "[g]eneral rule"

for calculating the all others rate.  *See* 19 U.S.C. § 1673d(c)(5)(A).  That general rule sets the all

others rate at "an amount equal to the weighted average of the estimated weighted average

dumping margins established for exporters and producers individually investigated, excluding

any zero and de minimis margins, and any margins determined entirely under" the facts available

statute. *Id.*

Section 1673d(c)(5)(A) only requires the exclusion of margins determined "entirely"

under facts available or AFA and is silent with regard to partial AFA rates. As a result,

Commerce could have reasonably interpreted the statutory language to allow the inclusion of

partial AFA margins in some circumstances. *See Chevron*, 467 U.S. at 843 (requiring deference

to an agency's reasonable construction of ambiguous statute).

Nonetheless, "it is possible for the application of a particular methodology to be

unreasonable in a given case." *Yangzhou Bestpak*, 716 F.3d at 1378 (quoting *Thai Pineapple

Canning Indus. Corp. v. United* States, 273 F.3d 1077, 1085 (Fed. Cir. 2001)). Moreover,

Commerce may not rely on a literal interpretation of the statute "at the expense of the reason of

the law and producing absurd consequences." *Sorrells v. United States*, 287 U.S. 435, 446

(1932). The court is concerned that Commerce's mechanical application of § 1673d(c)(5) in this

case undercut the actual purpose behind that statutory subsection and antidumping law

generally—that is, to calculate dumping margins as accurately as possible. *See, e.g.*, *Yangzhou

Bestpak*, 716 F.3d at 1379.

The two fully cooperative mandatory respondents in this case—Blue Field and XITIC—

received rates of 2.17% and 13.12%. By contrast, Commerce assigned Jisheng a partial AFA

rate of 266.13%. That rate is over 250% greater than the rates assigned to Blue Field and XITIC,

and it is also substantially higher than the 198.63% PRC-wide total AFA rate. Commerce would

not have included the 198.63% figure in its separate rate calculations, as the statute expressly

excludes total AFA margins. It is unclear how the inclusion of a figure 67.5% higher than that

and over 250% higher than rates assigned to other mandatory respondents is less distortional.

The Federal Circuit recently found that "rate determinations for nonmandatory, cooperating separate rate respondents must . . . bear some relationship to their actual dumping margins." *Id.* at 1380.  Because Commerce did not even address the seemingly anomalous result flowing from its separate methodology in this case, the court cannot find that Commerce "articulate[d] a satisfactory explanation for its action." *See id.* at 1378.  Therefore, Commerce did not support its calculations with substantial record evidence and remand is appropriate for additional investigation or explanation. *See id.* at 1380.

Although the Government argues that Commerce did not need to explain how Iceman Group's and Golden Banyan's margins reflected their commercial activities, the court disagrees. The Government asserts that the requirement that separate rates reasonably reflect dumping margins "attaches only when the record yields only zero or *de minimis* rates, or rates based entirely on facts otherwise available." Def.'s Br. 49.  In support of its argument, the Government cites the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act. *See* H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040.

In discussing § 1673d(c)(5), the SAA notes that the "general rule" is that Commerce will employ the procedure that it used in this case. *See id.* at 4201.  If all mandatory respondent margins are zero, *de minimis*, or based on total AFA, the statute contemplates an alternative method of weight averaging those margins. *Id.*  But if that alternative method "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce should use another reasonable method. *Id.*

According to the Government, if Commerce applies the general rule (i.e., weight averages all margins that are not zero, *de minimis*, or based on total facts available), it need not consider whether the resulting rate reasonably reflects potential dumping

margins for separate rate respondents. Def.'s Br. 49. While this is correct as a general

rule, it is nonetheless illogical not to expect that the preferred methodology should also

reasonably reflect potential dumping margins.  Consequently, where the data used clearly

indicates an unexplained anomaly, Commerce must articulate a reasonable basis for its

use of the anomalous result.  Because the circumstances here strongly suggest that

application of the preferred methodology does not reflect dumping margins (and indeed

thwarts the statute's intended purpose), Commerce must explain why its actions are based

on a reasonable reading of the record.

## CONCLUSION AND ORDER

For the foregoing reasons, the court concludes that Commerce must reconsider (1) the

surrogate values it applied to XITIC's inputs of lime and mushroom spawn; and (2) the

methodology it used to calculate separate rates in this review.  The court also grants Commerce's

request for a voluntary remand to recalculate XITIC's surrogate labor rate and financial ratios.

Upon consideration of all papers in proceedings in this case and upon due deliberation, it

is hereby

**ORDERED** that the *Final Results* and *Amended Final Results* be, and hereby are,
REMANDED to Commerce for reconsideration and redetermination in accordance with this
Opinion and Order; it is further

**ORDERED** that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record be,
and hereby is, GRANTED as provided in this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider its decision to use GTA data for Indian HTS
subheading 2522.20 as a surrogate value for lime, and in doing so, must determine whether such
surrogate represents the "best available information" on the record in accordance with 19 U.S.C.
§ 1677b(c)(1), as compared with alternative surrogates in the record; it is further

**ORDERED** that Commerce shall reconsider its decision to use GTA data for Indian HTS
subheading 0602.90.10 as a surrogate value for mushroom spawn, and in doing so, must
determine whether such surrogate represents the "best available information" on the record in

accordance with 19 U.S.C. § 1677b(c)(1), as compared with alternative surrogates in the record; it is further

      **ORDERED** that Commerce shall employ its revised labor methodology to recalculate XITIC's surrogate labor rate and financial ratios and, if appropriate, adjust the financial ratios; it is further

      **ORDERED** that Commerce shall explain whether the separate rates assigned to Iceman Group and Golden Banyan reasonably reflect the companies' potential dumping margins and, if warranted, redetermine those rates; and it is further

      **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that Plaintiffs shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiffs' comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: December 20, 2013
New York, New York