Slip Op. 14- 100

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| XIAMEN INTERNATIONAL TRADE AND INDUSTRIAL CO., LTD., ZHEJIANG ICEMAN GROUP CO., LTD., and FUJIAN GOLDEN BANYAN FOODSTUFFS INDUSTRIAL CO., LTD., <br><br>                                Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br>                                Defendant. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 11-00411<br><br>**PUBLIC VERSION** |

**OPINION**

[Sustaining the Department of Commerce's remand redetermination.]

Dated: August 28, 2014

  *Lizbeth R. Levinson* and *Ronald M. Wisla*, Kutak Rock LLP, of Washington, DC, for plaintiffs.

  *Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

  Goldberg, Senior Judge: This matter returns to the court following a remand of the U.S. Department of Commerce's ("Commerce") final results in an administrative review of the antidumping duty order on certain preserved mushrooms from the People's Republic of China ("PRC"). *See Xiamen Int'l Trade & Indus. Co. v. United States*, 37 CIT __, __, 953 F. Supp. 2d 1307, 1327 (2013) ("*XITIC*"). Commerce issued its final remand results on April 21, 2014. Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 29–30 ("*Remand*

*Results*"). Plaintiffs Xiamen International Trade and Industrial Co., Ltd. ("XITIC"), Zhejiang Iceman Group Co., Ltd. ("Iceman Group"), and Fujian Golden Banyan Foodstuffs Industrial Co., Ltd. ("Golden Banyan") assert that the *Remand Results* did not comply with the court's remand order and that another remand is needed. *See* Pls.' Comments on Remand Results, ECF No. 32 ("Pls.' Cmts."). As set forth below, the court sustains the *Remand Results*.

## BACKGROUND

Many of the facts relevant to this case were identified in the court's opinion in *XITIC*. *See* 37 CIT at __, 953 F. Supp. 2d at 1310–27. To briefly summarize, Plaintiffs instituted this litigation to challenge several findings from the 2009-2010 administrative review of the antidumping duty order covering certain preserved mushrooms from the PRC. *See Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 56,732, 56,732–33 (Dep't Commerce Sept. 14, 2011) (final admin. review) ("*Final Results*"); *Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 70,112 (Dep't Commerce Nov. 10, 2011) (am. final admin. review) ("*Amended Final Results*"). Specifically, XITIC contested Commerce's surrogate values for several of XITIC's inputs (lime, mushroom spawn, and fresh mushrooms) and for XITIC's labor and financial ratios. Pls.' Mot. for J. on Agency R. 5–25, Ct. No. 11-00378, ECF No. 23-1 ("Pls.' Br."). Uninvestigated respondents Golden Banyan and Iceman Group challenged the rate assigned to separate rate companies, and Iceman Group separately challenged the legality of its inclusion in the administrative review. *Id.* at 25–40.

The court granted Commerce's request for a voluntary remand to recalculate the surrogate values for XITIC's labor and financial ratios. *See XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1321. The court also found that Commerce did not identify substantial evidence supporting a conclusion that Commerce used the "best available information" regarding the market value of

XITIC's lime and mushroom spawn inputs. *Id.* at 1315, 1317. Lastly, the court identified an "unexplained anomaly" in Commerce's separate rate methodology that required further explanation. *Id.* at 1326–27.

On remand, Commerce adopted XITIC's proposed surrogate value for lime but continued to value mushroom spawn using the same data from its original determination. *Remand Results* 6, 12. Commerce also used its revised labor methodology to calculate a surrogate value for XITIC's labor. *Id.* at 13. Finally, Commerce continued to use the same separate rate methodology on remand and offered an explanation for the seemingly anomalous figure resulting from that methodology. *Id.* at 16–21.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and must sustain Commerce's remand redetermination if it is supported by substantial record evidence, accords with law, and is consistent with the remand order. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 38 CIT __, __, 992 F. Supp. 2d 1285, 1290 (2014).

## DISCUSSION

Plaintiffs do not contest Commerce's resolution of the surrogate values for lime and labor,[1] but maintain that the *Remand Results* otherwise fail to accord with the court's remand orders. For the following reasons, the court sustains the *Remand Results*.

I. **Commerce's decision to use GTA import data to value XITIC's mushroom spawn input was supported by substantial evidence**

XITIC first argues that Commerce's surrogate value for XITIC's white button mushroom spawn input was not supported by substantial evidence. In particular, XITIC claims that Commerce failed to explain why Global Trade Atlas ("GTA") import data for HTS subheading

---

[1] Because Plaintiffs agree with Commerce's determinations regarding XITIC's surrogate labor rate and financial ratios and the surrogate value for lime, the court sustains the *Remand Results* on those issues.

0602.90.10 were the best available information regarding the market value of XITIC's input. XITIC's primary contention is that the GTA data are insufficiently specific.

### A. Legal framework

In non-market economy ("NME") proceedings, Commerce constructs a hypothetical market value for the merchandise subject to an antidumping duty order. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999). Commerce arrives at this figure by valuing the factors of production used in producing subject merchandise plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1). 19 U.S.C. § 1677b(c)(1) requires that Commerce value factors of producing using "the best available information regarding the values of such factors in a market economy country" or other appropriate countries. *Id.*

Because there is no statutory definition of the "best available information," Commerce has established a series of policy preferences. Specifically, Commerce prefers surrogate values "that are contemporaneous with the period of review, publicly available, product-specific, representative of broad market average prices, and free of taxes and import duties." *XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1312–13 (citing I&D Mem. 7, PD II 10 (Sept. 6, 2011), Ct. No. 11-00378, ECF No. 16 (Dec. 12, 2011) ("*I&D Mem.*")). Section 1677b(c)(1) does not require perfection, and Commerce must often make "a judgment call" about which of multiple flawed data sets constitutes the "best" information. *See Lifestyle Enter., Inc. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014). The court's role in reviewing Commerce's surrogate value selections is not to reweigh the evidence, but to determine "whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quotation mark and citation omitted).

B. **Background**

With that framework in mind, some background is helpful. Prior to remand, Commerce used GTA import data for Indian HTS subheading 0602.90.10 (mushroom spawn) to value XITIC's spawn input at 217.37 Rupees/kilogram ("Rs./kg."). Prelim. Surrogate Value Mem. 6, PD I 110 (Feb. 28, 2011), Ct. No. 11-00378, ECF No. 16 (Dec. 12, 2011). Commerce thus rejected XITIC's proposed surrogates—values of 115.38 Rs./kg. contained in a 2004-2005 annual report from Agro Dutch Limited ("Agro Dutch") and 36.97 Rs./kg. contained in a 2007-2008 annual report from Himalya International Limited ("Himalya"). *See* XITIC Proposed Surrogate Values 3, PD I 92 (Nov. 22, 2010), Ct. No. 11-00378, ECF No. 16 (Dec. 12, 2011). Commerce dismissed XITIC's proposed surrogates because they were "not representative of broad market averages, free of taxes and import duties, or contemporaneous with the" review period. *I&D Mem.* 28. Commerce also dismissed the reliability of the Agro Dutch and Himalya data based on a series of questionable inferences. Specifically, Commerce relied on language from a 2009-2010 annual report for a different Indian mushroom producer, Flex Foods Limited, to conclude that Agro Dutch and Himalya purchased low quality spawn and that their spawn did not match XITIC's high-quality spawn.[2] *See id.* At no point did Commerce explain why the GTA data that it selected to value mushroom spawn were the "best available information" regarding the market value of XITIC's input. *See* 19 U.S.C. § 1677b(c)(1).

XITIC challenged Commerce's decision before this court, and the court agreed that Commerce's surrogate value was not grounded in substantial evidence. Because Commerce's analysis was entirely focused on the flaws in XITIC's proposed surrogate values, Commerce neither critically evaluated the GTA data nor explained why that data were superior. *See XITIC,*

---

[2] On remand, Commerce conceded that the record did not contain any information regarding the quality of spawn used by XITIC, Agro Dutch, or Himalya. *Remand Results* 11. Commerce thus abandoned reliance on that portion of its analysis. *Id.*

37 CIT at \_\_, 953 F. Supp. 2d at 1316. Furthermore, the court cited Commerce's unsupported findings regarding spawn quality and concluded that Commerce poorly reasoned its rejection of XITIC's proposed surrogate values. *Id.* at 1317. Absent a more searching analysis, the court determined that substantial evidence did not support a conclusion that the GTA data were the "best available information" to value mushroom spawn. *See id.*

Commerce continued to find on remand that the GTA data were the "best available" information to value mushroom spawn because that data "satisf[ied] the breadth of the Department's selection criteria." *Remand Results* 27. But this time Commerce offered a more thorough explanation for its decision. Commerce first found that XITIC used white button mushroom spawn in its production process. *Id.* at 8. Commerce then compared the three potential surrogate values against its preference for broadly representative, contemporaneous, publicly available, tax-free, import duty-free, and product-specific data. *Id.* at 8–12.

Commerce concluded that the GTA data satisfied all but arguably the last of these criteria. *Id.* at 8–9. In particular, Commerce found that the GTA data covered mushroom spawn and were thus specific to XITIC's input, but acknowledged that the data *may* include varieties of spawn other than white button mushroom spawn. *Id.* However, Commerce was unable to reach any meaningful conclusions regarding the specificity of the GTA data because nothing on the record established either that the GTA data included multiple varieties of mushroom spawn or that spawn prices varied significantly by mushroom type. *Id.* at 8–10. Commerce lastly found that the GTA data were contemporaneous with the review period, publicly-available, representative of a broad market average, and tax- and import-duty free. *Id.* at 9.

The Agro Dutch and Himalya data were comparatively less appropriate as valuation sources. *Id.* Regarding the Himalya data, Commerce concluded that nothing on the record

established that the Himalya annual report was specific to white button mushrooms. *Id.* at 10. For that reason, Himalya's data were not demonstrably more or less specific to XITIC's input than the GTA data. *Id.* However, unlike the GTA data, the Himalya data were also not contemporaneous with the review period, not representative of broad market averages, and possibly not tax- and import-duty free. *Id.* at 11. Commerce found that the data from Agro Dutch's annual report were similarly deficient, except that there was evidence supporting a conclusion that Agro Dutch principally produced white button mushrooms during the period covered by the annual report. *Id.* at 9–10. As a result, Commerce determined that the Agro Dutch data were "likely more specific than the GTA data." *Id.* at 10.

### C. Substantial evidence supports Commerce's surrogate value for XITIC's mushroom spawn input

XITIC asserts that Commerce's surrogate value for mushroom spawn continues to be unsupported by substantial evidence and fails to accord with the court's instructions in *XITIC*. Specifically, XITIC argues that the *Remand Results* again focus heavily on flaws in the Agro Dutch and Himalya data while ignoring specificity concerns in the GTA data. Pls.' Cmts. 5. According to XITIC, product specificity is "fundamental" to the selection of surrogate values and "[i]f a set of data is not sufficiently product specific, it is of no relevance whether or not the data satisfy the other criteria." *Id.* XITIC submits that Commerce's behavior in this case was particularly "perplex[ing]" because Commerce has previously rejected basket GTA data in favor of surrogate values that more closely matched a company's actual input. *See id.* at 6–8.

The court disagrees that Commerce's analysis on remand merely identified flaws in the Agro Dutch and Himalya data without critically assessing the GTA data. Commerce applied the same analytical criteria to all three data sets in this case and found that the GTA data fit its policy preferences better than the other data. *See Remand Results* 27. Although XITIC argues

otherwise, Commerce neither elevated contemporaneity (or any other factor) above specificity nor accorded undue weight to a particular factor in its surrogate value analysis.

Citing the court's opinion in *Taian Ziyang Food Co. Ltd. v. United* States, 35 CIT __, 783 F. Supp. 2d 1292 (2011), XITIC evidently believes that product specificity necessarily trumps all other considerations when valuing a NME company's inputs. Pls.' Cmts. 5. However, the language in *Taian* that suggested specificity was of utmost importance cannot be taken out of context. *See* 35 CIT at __, 783 F. Supp. 2d at 1330. The *Taian* court was merely illustrating that the overriding purpose of the surrogate value analysis is to construct a normal value based on a company's *actual* inputs. Thus, the *Taian* court noted that Commerce could not reasonably use data on fishing rods to value cardboard packing cartons regardless of whether the fishing rod data satisfied the rest of Commerce's preferred criteria.

Commerce's actions in this case do not resemble the hypothetical example from *Taian*. GTA data for mushroom spawn undeniably includes XITIC's input of white button mushroom spawn. Commerce did not use data for fishing rods to value mushroom spawn; Commerce used data for mushroom spawn to value mushroom spawn. While the GTA data *may* encompass other spawn varieties not used in XITIC's production process, XITIC identifies no evidence confirming that possibility. Nor does XITIC cite any proof that the GTA figure was artificially inflated due to these other varieties of spawn or some other distortion like low import volume.

Specificity is an important consideration in Commerce's analysis, and Commerce ideally (and reasonably) prefers perfectly specific data over less specific, broader HTS data.[3] But

---

[3] In an effort to undermine Commerce's *Remand Results*, XITIC cites certain administrative proceedings and cases where Commerce and the court have expressed a preference for specific data over basket import data. *See* Pls.' Cmts. 6–7. But a preference does not amount to an unyielding rule and, in any event, XITIC's citations do not involve substantially similar facts to those at issue here. For instance, XITIC argues that Commerce's rejection of HTS import data in this administrative review to value cow manure is inconsistent with its acceptance of HTS import data when valuing mushroom spawn. *Id.* at 6. But the import data proposed to value cow manure was

(footnote continued)

Commerce's decision in this case was not between perfect, specific data and perfect, less-specific data. Rather, all possible data sources were flawed and Commerce had to make a "judgment call" regarding which of the flawed sources was the "best." *See Lifestyle*, 751 F.3d at 1378. While the 2004-2005 Agro Dutch annual report contained data that were likely slightly more specific to XITIC's input, the report was also several years old, represented only one company's experience in the market, and may have included taxes or import duties. Although the Himalya annual report was comparatively more recent, Commerce concluded that nothing in that report established that Himalya only produced white button mushrooms.[4] The Himalya data were thus not conclusively more specific to XITIC's input and in any event suffered from flaws not present in the GTA data (the data were not contemporaneous, did not represent broad market averages, and may have included taxes or import duties).

After weighing all data sets, Commerce concluded that the GTA data satisfied the "breadth of the Department's selection criteria." *Remand Results* 27. Based on the record before the court, a reasonable mind could agree that Commerce selected the best available information to value mushroom spawn. *See Jacobi Carbons AB v. United States*, 38 CIT __, __, 992 F. Supp. 2d 1360, 1373 (2014) (sustaining Commerce's decision not to use data with a "slight

---

demonstrably broader than that used to value mushroom spawn, as the HTS category by its very terms covered both animal and vegetable fertilizers. *See I&D Mem.* 12; *Remand Results* 26. Furthermore, unlike with mushroom spawn, Commerce had an alternative source to value cow manure that was contemporaneous, input-specific, publicly available, and likely representative of broad market averages. *See I&D Mem.* 12.

[4] XITIC apparently misunderstands Commerce's conclusions regarding the specificity of XITIC's proposed surrogate values. Commerce never concluded that the Agro Dutch *and* Himalya data were "not more specific to XITIC's input than the GTA data." *Cf.* Pls.' Cmts. 3. In fact, Commerce reached that conclusion only with regard to the Himalya data and XITIC cites no record evidence undermining that finding. *See Remand Results* 10. Instead, XITIC submits without any evidentiary support that "Himalaya [sic] has been reviewed several times as a producer and processor of white button mushrooms under the Indian antidumping duty order." Pls.' Cmts. 5. XITIC also appears to rely on 2009-2010 annual reports for Flex Foods Limited and Agro Dutch to establish that white button mushrooms are important to India's mushroom industry and Himalya thus produced white button mushrooms from 2007-2008. *See id.* at 4–5. But it is unclear how those reports, which are two years older than Himalya's report and which do not appear to reference Himalya, establish that proposition. *See Remand Results* 25–26.

superiority in specificity" where the data were flawed in several other respects). The court declines to reweigh the evidence and sustains Commerce's supported decision.

II. **Commerce has articulated a reasonable explanation for its continued use of its original separate rate methodology**

Uninvestigated separate rate respondents Golden Banyan and Iceman Group next claim that Commerce's *Remand Results* did not identify substantial evidence supporting a 74.14% separate rate. Golden Banyan and Iceman Group specifically argue that Commerce's analysis on remand failed to explain how a figure of 74.14%—seemingly distorted by the inclusion of a 266.13% margin—reflected the economic reality of cooperative separate rate respondents.

A. **Legal framework**

Commerce usually determines individual weighted average dumping margins for all known exporters and producers of subject merchandise. 19 U.S.C. § 1677f-1(c)(1). However, Commerce may limit the number of companies that it investigates if, "because of the large number of exporters or producers involved in the . . . review," individual investigation is impracticable. *Id.* § 1677f-1(c)(2). If Commerce reasonably reaches that determination, Commerce frequently limits its individual examination to the largest known producers or exporters of subject merchandise during the period under review. *Id.* § 1677f-1(c)(2)(B). Companies selected for individual review are called "mandatory respondents," and the rates calculated for those respondents are presumed to represent all respondents. *See Navneet Publ'ns (India) Ltd. v. United States*, Slip Op. 14-87, 2014 WL 3825886, at *9 (CIT July 22, 2014).

Commerce often at least partially bases rates for uninvestigated, cooperative companies on mandatory respondent rates. In market economy cases, the rate assigned to uninvestigated, cooperative companies is called an "all-others rate" and is calculated using the tiered methodology from 19 U.S.C. § 1673d(c)(5). Section 1673d(c)(5)(A) requires as a "[g]eneral

rule" that Commerce calculate all-others rates using the weighted average of the weighted average dumping margins for individually investigated companies, excluding zero or *de minimis* rates and rates based "entirely" on facts available.  However, if no rates remain after making those exclusions, § 1673d(c)(5)(B) instructs Commerce to use "any reasonable method."  The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act contains guidance on what constitutes a "reasonable method" for purposes of § 1673d(c)(5)(B) and clarifies that the "reasonable method" must generate a rate that is "reasonably reflective of potential dumping margins for non-investigated exporters or producers."  *See* H.R. Rep. No. 103-316, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201.

Although not compelled by statute, Commerce uses the methodology from § 1673d(c)(5) to calculate separate rates in NME cases.  *See XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1322.  Separate rate companies have established a certain degree of independence from the NME-wide entity that justifies assigning those companies a different rate than would otherwise be imposed against the country-wide entity.  *Id.*  The country-wide rate is usually based entirely on adverse facts available ("AFA").  *Id.*

   B. Background

In this case, Commerce used the "[g]eneral rule" in § 1673d(c)(5)(A) to calculate separate rates for uninvestigated, cooperative respondents Golden Banyan and Iceman Group (among other companies).  Specifically, Commerce calculated separate rates by weight averaging the weighted average dumping margins calculated for mandatory respondents XITIC, Blue Field (Sichuan) Food Industrial Co., Ltd. ("Blue Field"), and Guangxi Jisheng Foods, Inc ("Jisheng").  *Final Results*, 76 Fed. Reg. at 56,733.  Jisheng's margin of 266.13% was

substantially greater than the margins calculated for XITIC (13.12%) and Blue Field (2.17%) and even exceeded the country-wide rate based entirely on AFA (198.63%). *See id.* at 56,733–34 (containing final margins for XITIC, Jisheng, and PRC-wide entity); *Amended Final Results*, 76 Fed. Reg. at 70,113 (containing final margin for Blue Field). Nonetheless, because § 1673d(c)(5)(A) expressly requires the exclusion only of rates determined "entirely" under facts available, Commerce did not exclude Jisheng's *partial* AFA margin from its calculations.

Golden Banyan and Iceman Group argued that Commerce's methodology was neither supported by substantial evidence nor in accordance with law. Those companies disagreed that Commerce could include Jisheng's partial AFA margin in its calculations when it would have excluded Jisheng's margin had Jisheng been assigned a comparatively lower PRC-wide rate. Pls.' Br. 37. Golden Banyan and Iceman Group asserted that Commerce's actions were based on an unreasonable interpretation of the statute and undercut § 1673d(c)(5)'s purpose of preventing unrepresentatively high margins from distorting cooperative, uninvestigated respondent rates. *Id.* Golden Banyan and Iceman Group argued alternatively that Commerce at a minimum could not use a seemingly unrepresentative margin without further explanation. *Id.* at 38–40.

The court determined that Commerce reasonably interpreted § 1673d(c)(5)(A) to permit the separate rate methodology that it used in this case. *See XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1326 (noting that statute required the exclusion of rates based "entirely" on facts available, and Jisheng's rate was based only partially on facts available). Nonetheless, the court agreed that it could not sustain the separate rates assigned to Golden Banyan and Iceman Group without further explanation. *Id.* at 1327. In so holding, the court rejected the Government's suggestion that Commerce was not required to consider whether margins calculated under § 1673d(c)(5)(A) reasonably reflected economic reality for separate rate respondents because that analysis applied

only when Commerce proceeded under § 1673d(c)(5)(B). *Id.* While holding that the Government was "correct as a general rule," the court found it "illogical not to expect that the preferred methodology should also reasonably reflect potential dumping margins." *Id.* Consequently, the court concluded, "where the data used clearly indicates an unexplained anomaly, Commerce must articulate a reasonable basis for its use of the anomalous result." *Id.*

On remand, Commerce used the same methodology to calculate a revised separate rate of 74.14% (down from 76.12% in the *Final Results* due to the intervening change in XITIC's weighted average dumping margin). *See Remand Results* 17. However, Commerce offered a more thorough justification for its use of Jisheng's margin. Commerce first found that Jisheng was one of the largest producers of subject merchandise during the review and that Jisheng's sales practices represented the pricing behavior of other respondents. *Id.* Furthermore, Commerce found that Jisheng's average shipment volume was comparable to the range exported by XITIC and Blue Field and that the merchandise sold was physically similar to merchandise sold by Blue Field. *Id.* at 18. Commerce also concluded that the application of partial AFA had a relatively minor impact on Jisheng's overall margin. *Id.* at 18–19. Indeed, Commerce calculated that Jisheng still would have received a weighted-average dumping margin of [[ ]]% even omitting the U.S. sales to which AFA had been applied. *Id.* at 19. Finally, Commerce noted that Jisheng's margin was not anomalous when compared against mandatory respondents' margins of 308.33% (later revised to 82.04% on remand) and 223.74% in the subsequent review of the mushroom order. *Id.* at 20 (citing *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808, 55,809 (Dep't Commerce Sept. 11, 2012) (final admin. review)); *see also* Order, Ct. No. 12-320, ECF No. 51 (sustaining remand results)).

### C. Commerce articulated a reasonable explanation for the separate rate that it calculated in the *Remand Results*

Golden Banyan and Iceman Group submitted comments arguing that Commerce again failed to explain why the inclusion of a margin of 266.13% is somehow less distortional than the total AFA margin of 198.63% that would have been excluded from Commerce's margin. Pls.' Cmts. 9. It appears that Golden Banyan and Iceman Group seek the altogether exclusion of Jisheng's margin from Commerce's calculations.

But with the benefit of additional explanation, the court declines to require further analysis from Commerce. As noted, Commerce calculated the separate rate in this case using § 1673d(c)(5)(A)'s preferred methodology. When enacting § 1673d(c)(5)(A), Congress evidently decided that margins calculated for individually investigated respondents that were neither zero, *de minimis*, nor based entirely on facts available reflected potential dumping margins for uninvestigated, cooperative respondents. Thus, Congress did not expressly require separate consideration of the representativeness of mandatory respondent rates unless Commerce proceeded under the alternative methodology of § 1673d(c)(5)(B).

Nevertheless, the court sought further analysis in this case because of the possibility that Commerce's preferred methodology resulted in a figure not fairly representative of Golden Banyan's and Iceman Group's sales practices. *See XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1327. Specifically, the court noted the large gap separating Jisheng's margin from Blue Field's and XITIC's margins and expressed concern that the application of partial AFA in this case had an unusually large impact on Jisheng's margin or that some other unknown factor rendered Jisheng's margin anomalous and unrepresentative.

On remand, Commerce offered additional insight into Jisheng's margin. *See Remand Results* 16–21. Commerce found that (1) Jisheng was one of the largest known exporters of

subject merchandise during the review, (2) Jisheng's data paralleled mandatory respondent data in terms of average shipment volume and range of products, (3) Jisheng's margin was consistent with a mandatory respondent margin calculated in the subsequent administrative review; and (4) Jisheng's margin almost certainly would have [[         ]] the PRC-wide rate even if based exclusively on Jisheng's own reported data.

Golden Banyan and Iceman Group contest none of these findings. Taken as a whole, then, the record now establishes with substantial evidence that there is no clear distortion in Jisheng's margin except that the margin is substantially higher than the margins calculated for other mandatory respondents. But a wide range in margins, without identifying any distortion, does not override the assumption inherent in 19 U.S.C. § 1673d(c)(5)'s structure that mandatory respondent rates that are not zero, *de minimis*, or based entirely on facts available reflect uninvestigated respondents' margins as a whole. The court thus sustains the *Remand Results* as they pertain to the calculation of Golden Banyan's and Iceman Group's separate rates.

## CONCLUSION

For the foregoing reasons, Commerce's *Remand Results* are sustained. Judgment will enter accordingly.

/s/ Richard W. Goldberg  
Richard W. Goldberg  
Senior Judge

Dated: August 28, 2014  
New York, New York